MARIO MERCADO RIERA, Accountant and Appellant-Appellee, *v.* ADRIÁN MERCADO RIERA ET AL., Respondents and Appellees-Appellants.

No. 8911. Argued January 12, 1945.—Decided May 8, 1946.

38

*Francisco Parra Capó* and *Pedro M. Porrata* for appellant-appellee. *José A. Poventud, Celestino Iriarte, F. Fernández Cuyar,* and *H. González Blanes* for respondents and appellees-appellants.

MR. CHIEF JUSTICE TRAVIESO delivered the opinion of the court.

On July 14, 1943, we rendered judgment in certiorari case No. 1517, setting aside the order sought to be reversed, holding that the term of the executorship pertaining to the estate of Mario Mercado Montalvo, who died testate on August 22, 1937, expired, by operation of law, on September 1, 1939, and ordering the ex-executor Mario Mercado Riera to proceed to deliver the estate to all the heirs of the deceased, in compliance with the terms of the compromise contract of September 9, 1938, and also to render supplementary accounts as from August 27, 1941, when he rendered his former accounts, until the time of such delivery, for all of which he was allowed the term of sixty days. (*Mercado* v. *District Court,* 62 P.R.R. 350.)

Feeling aggrieved by that judgment the former executor appealed therefrom to the United States Circuit Court of Appeals for the First Circuit. On November 23, 1945, that court affirmed the judgment appealed from and imposed costs on the appellant.

The case which we are now to consider and decide relates to the accounts of the executorship.

On March 6, 1940, Mario Mercado Riera, as executor of his deceased father, Mario Mercado Montalvo, submitted for the approval of his brothers and sisters and coheirs Margarita, María Luisa, and Adrián Mercado Riera the final accounts of his executorship up to March 4, 1940, subject to supplementary accounts. The accounts included the fruits, rents, and other accessions pertaining to the estate and also a general statement setting forth the contractual accounts of the inheritance. The total amount of the receipts was

$772,864.30 and that of the charges and disbursements was $665,704.92. The cash available as bank deposits and other assets on that date amounted to $107,159.38.

The heirs Adrián Mercado Riera and María Luisa Mercado de Belaval filed objections and exceptions to the following items:

1. "Restoration of house at Marina No. 23, $25,434.16." The opposing heirs alleged that, under the compromise contract of September 9, 1938, the executor was authorized to invest in the restoration of that property only the sum of $14,200; that the executor was never authorized by the heirs to make the additional disbursement of $11,234.16; and that the additional sum had been expended by the executor subsequent to his acquisition of the property by virtue of the aforesaid compromise contract and deed No. 204 of September 27, 1938, executed before Notary Fernando Zapater.

2. The item entitled "Aid to impecunious persons, $5,721.52," was challenged because it was general and ambiguous; because it did not constitute a testamentary charge nor a debt of the deceased; because it had not been acknowledged by the heirs in the compromise contract nor had the executor been authorized to incur the expenditure involved. A like objection was made to the sums totalling $10,484.75 which appeared to have been delivered between August 1937 and February 17, 1940, to Florencia Cora "for distribution among various persons."

3. The entry entitled "Liabilities of the deceased paid by the administrator, $55,676.56," was challenged as being difficult to verify, "since it can not be determined to what items of liability it refers, the total liabilities having been paid, according to the quarterly accounts."

4. The item entitled "Scholarships for indigent students, $10,176.79," was challenged because it was not a testamentary charge or hereditary debt, nor had been acknowledged by

the heirs in the compromise contract; and because the executor lacked legal power or authorization from the heirs to make such disbursements.

5. The item entitled "Taxes paid, $15,682.33," was challenged in so far as it might include taxes paid after September 9, 1938, on the house at No. 23 Marina St., Ponce, P. R.

6. Item for "Interest paid, $36,100.64," was challenged because it improperly included the sum of $16,392.25, which it was incumbent on the partnership Mario Mercado e Hijos to pay as interest on $161,199.77, which was a part of a larger sum owed by that partnership, first to the deceased and then to his heirs, in accordance with the above-mentioned compromise contract and deed No. 204 of September 27, 1938.

7. Item entitled "Payments made on account of instalments of principal and interest due legatees," amounting to $86,250. It was challenged for the following reasons:

(a) If from the one-fourth portion of the principal amount of the legacies thus paid no deduction had been made on account of the inheritance taxes corresponding to each legatee and of the advances made to some legatees without any prorating among those of equal rank; and the amount paid to the legatee Humbelina Ventura was challenged if she had not been charged with the sum of $1,598 which, without any authorization from the heirs, was delivered to her on account of weekly allowances, boarding, and furniture.

(b) Because notwithstanding the existence of sufficient assets to pay the legacies and interest thereon, the same were not timely paid and in consequence thereof an unnecessary expenditure for interest amounting to $2,102.98 was incurred.

(c) Regarding the sum of $3,500, paid as a first instalment and interest thereon to the alleged legatee Adrián V. Mercado Jiménez, the opposing parties contended that he was not a legatee but a beneficiary, by gift *inter vivos,* under the compromise contract, which gift amounting to $10,000 was not subject to an inheritance tax, and must be paid to the

father of the minor and not to the guardian designated in the will for the legatee subject to guardianship.

8. The entry entitled ''Payment of income on life annuities, $9,852.14,'' was challenged in so far as it exceeded the sum of $7,350, which is the amount corresponding to the four legatees of life annuities on account of the thirty monthly instalments accrued from August 22, 1937, to February 22, 1940, without the executor being empowered to make additional payments to said legatees.

9. The following disbursement items: (a) Payment to Attorney Pedro M. Porrata, on account of fees for representing the estate in connection with the matter of federal and state taxes, $18,000; (b) traveling expenses of the executor and Attorney Porrata from September 10, 1938, to March 15, 1939, $12,000; and (c) for extra expenses of Attorney Porrata during his sojourn in the United States, $1,450. These disbursements were challenged as improper; because the executor lacked power to make them without previous authorization from the heirs; because the items were not accompanied by a detailed statement of the alleged expenses and services nor by the corresponding vouchers; and because the expenses exceeded the amount established by the interested parties in the compromise contract.

10. The item of $20,000 for administration expenses, fees of accountants, assessors, preservation of property, etc., was challenged because it had not been authorized by the court nor by the heirs and because the expenses making up that item where not stated in detail.

11. The item entitled ''Fees of executor, $10,257.41,'' was challenged because what was agreed among the heirs was that the executor would be entitled ''to any compensation established by law in his favor'' which should be previously fixed by the court; and because according to the law the executor in this case would only be entitled to $950 in view of the income reported in the final account.

12. Item entitled "Inheritance tax and interest paid to the People of Puerto Rico for account of the four heirs, $129,331.64." The opposing parties alleged:

(a) That they were not bound to pay one-half of the $26,904.58 collected by the Treasurer as accrued interest on the inheritance tax, because despite the existence of sufficient assets for paying the tax within the statutory period, the executor, without any justification therefor, failed to file in time the notice regarding the death and estate of the testator and, in consequence of his inexcusable delay, the heirs were charged with the payment of interest.

(b) That against the protest of the opposing parties, the executor paid to the Insular Treasury the sum of $20,019.15 as inheritance tax on $320,306.53; that in connection with said notice of death the executor reported the sum of $576,306.53 as funds or bank deposits belonging to the testator, which was in conflict with the stipulations of the compromise contract wherein it was acknowledged that $256,000 and interest thereon passed to the heirs (sucesión) and that "the sum of $320,306.53 and interest . . . had belonged and still belongs exclusively to the partnership Mario Mercado e Hijos; and that for the reasons stated the opposing parties should not be compelled to pay one-half of said sum of $20,019.15 improperly disbursed for interest."

13. Liability item designated thus: "Passbook No. 2281 of Banco de Ponce, improperly inventoried, $325.81." This item was challenged because it had appeared as an asset of the estate and the executor lacked power to cancel it as a liability without judicial intervention or authorization from the heirs.

On June 7, 1940, the opposing heirs filed the following additional objections:

(a) That the final account of the executor failed to include the sum of $45,359.50 loaned by the deceased to the partnership Mario Mercado e Hijos, to be deposited, as it was in

fact deposited, in the case entitled *Mario Mercado e Hijos* v. *Elvira Olivieri et al.,* Civil No. 310 of the District Court of Ponce.

(*b*) That the claim against the partnership Mario Mercado e Hijos, which appeared in the final account as amounting to $413,064.63, was accepted by the accountant herein as amounting to $428,600.33, according to the inheritance tax receipt.

(*c*) That the final account failed to include the sum of $6,841.06 left by the decedent in the partnership Mario Mercado e Hijos and which represented his share of the profits for one month and twenty days, up to his death on August 22, 1937.

(*d*) That although the accounts included several charges for payments made in connection with the collection of life insurance policies belonging to the deceased, the proceeds of the policies, which should amount to not less than $7,689.20 do not appear among the receipts pertaining to the executorship.

(*e*) That in the accounts of profits payable by Bazar Atocha there is a difference in favor of the heirs amounting to $400.26.

(*f*) That in the books of Mario Mercado e Hijos there was a credit entitled *"Fondo Panteón de Familia"* in favor of the heirs for $5,250, which was not included in the challenged accounts.

The ex-executor in his answer set up, in the first place, the defense of lack of jurisdiction: (1) because no accounts had been filed which might be subject to challenge, such filing not having been made in view of the stipulations agreed to by the heirs in the compromise contract of September 9, 1938; and (*b*) because it had been agreed in said contract that no judicial action would be taken until an attempt was made to reach an amicable settlement among the heirs, which requisite had not been complied with.

Answering the objections set up against the above-stated items, the ex-executor alleged, in brief, as follows:

1. That, according to the compromise contract, he had power to make the disbursement incurred by him in connection with the "restoration" of the house at No. 23 Marina St.; and that the expenditures in excess of $14,200 were incurred pursuant to a contract between the testator and engineer Rivera for the restoration of said house, which was held by the deceased in usufruct.

2. That the payments in favor of physically incapacitated persons were made in fulfillment of express agreements and orders of the deceased; and that in the quarterly accounts rendered to the heirs, the executor had always given to them the necessary information relating to each item.

3. That the items making up the entry "Liabilities of the deceased paid by the executor, $55,676.56," might be easily verified by the mere reading of the quarterly accounts rendered to the opposing parties during the period from November 30, 1937, to February 17, 1940.

4. That the payments for scholarships to impecunious students were made in compliance with the express wishes of the deceased and of the obligation contracted by the testator with said students to defray their expenses until they finished their studies; and that any default in said payments would have caused irreparable injury to the young students.

5. That the executor had been expressly authorized by the compromise contract to pay the taxes pertaining to the house at No. 23 Marina Street.

6. That the heirs are bound to pay the whole of the sum of $36,100.64 charged as interest. Said sum consists of interest on $161,199.17 owed by the deceased—and not by Mario Mercado e Hijos—and on the remaining portion of the liabilities which appeared in the inventory of the estate. The payments were alleged to have been made in accordance with the compromise contract.

7. (a) That in making the payments to the legatees the executor never failed to deduct from each payment the amount of the inheritance tax and interest chargeable against each legatee.

(b) That the assertion that the executor had funds available for the payment of the legacies before the time they were actually paid was erroneous; and, furthermore, that the controversy with the Federal Government regarding decedent's estate prevented the application of the assets of the estate to the payment of the liabilities until said controversy was settled on March 9, 1939.

(c) That according to the compromise contract (Third Clause, subdivision (j), par. 2) "the ten thousand ($10,000) dollars included in the inventory for the minor son of Don Adrián Mercado Riera, shall be subject to the same conditions pertaining to the legacies made in favor of the grandchildren and great-grandchildren in the will."

8. That the payments to the legatees Florencia Cora, Rosa Arce, Josefina Oquendo, and María N. Delgado, covering the total amounts accrued up to February 22, 1940, were made in accordance with the terms of the compromise contract; and that the amount of the inheritance tax chargeable against each of these legatees was deducted from each payment.

9. That the executor had power, under the compromise contract and the law, to pay the fees of Attorney Porrata and the traveling expenses incurred by the latter and the executor. That the extra expenses of Attorney Porrata were necessary and indispensable in order to avoid outlays and losses chargeable against the estate, such as a considerable amount for federal inheritance taxes; and, moreover, that said expenses were authorized by the compromise contract.

10 and 11. That the sum of $10,257.41 charged as compensation for the executor was just and reasonable and that it represented the amount which he was entitled to charge on a total of $1,098,241.28, received by him up to the date

of the rendition of his accounts; and that the compromise contract authorized him to pay himself the compensation granted by law.

12. That the delay in paying the insular inheritance tax was due to the fact that the Federal Government sought to collect the federal inheritance tax not only on the $200,000 deposited in the National City Bank, in New York, but also on the remaining portion of the estate located outside of the continental United States; and this made it necessary for the representative of the estate to remain in the United States until a decision favorable to the heirs was obtained on March 9, 1939.

That on September 19, 1939, the executor took an appeal to the Board of Review and Equalization from the imposition of the tax by the Treasurer; that as a result of the steps thus taken all the heirs were greatly benefited by the saving of a sum larger than the one paid by them as interest.

The ex-executor alleged that he acted correctly in paying the sum of $20,019.15 as inheritance tax on $320,306.53, which formed part of the $576,306.53 deposited to the credit of the decedent in various banks, for the following reasons:

(a) Because in accordance with the compromise contract, said sum of $320,306.53 must be and was set aside in full in order to create the reserve fund for the partnership Mario Mercado e Hijos.

(b) Because the opposing heirs were opportunely advised that in the notification of death sent to the Treasurer the total amount of $576,306.53 was declared, and said heirs failed to file any protest with the Treasurer or to take any appeal when they were informed that the Treasurer had imposed a tax on the total amount thus reported. It was alleged that said heirs were precluded from recovering from the executor the amount paid to the Treasurer.

13. The sum of $325.81 set forth in passbook No. 2281 of Banco de Ponce was claimed by a third person and it was

established that said sum did not belong to the estate but to the claimant. The executor notified this charge to all the heirs and to the Treasurer of Puerto Rico.

The answer ended with the prayer that the opposition be terminated, as it is directed against a supposed final accounts which had not been filed; and, also, because, according to the compromise contract, the executor was not bound to file his final accounts in court until the heirs should be unable to reach an amicable settlement within five days after service of a demand therefor by any one of the contracting parties. It was alleged that the opposition had been filed prematurely and that it should be dismissed.

The hearing began on October 14, 1940, and continued through numerous sessions of the lower court, the last session being held on May 27, 1941, when the case was finally submitted to that tribunal.

On February 19, 1942, the lower court entered a "final order or writ," approving the final account submitted by the testamentary executor with the following modifications and alterations:

"(A).—The item of the final account, entitled 'Restoration of house at No. 23 Marina St. ($24,434.16)' should be reduced to the sum of $14,200.

"The executor is ordered to restore to *the assets* in the final account the sum of $11,234.16, with interest thereon at the legal rate of 6 per cent per annum from February 29, 1940.

"(B).—The item of the final account entitled *'Taxes paid ($15,682.33)' should be reduced in the sum of $56.66,* which should be restored by the executor to *the assets* in the final account.

"(C).—The item of the final account entitled *'Interest* paid. ($36,100.64)' *should be reduced in the sum of $16,392.25;* and the executor should restore said sum to *the assets* in the final account, with interest thereon at 6 per cent per annum from March 4, 1940, when the final account was closed.

"(D).—In the item of the final account regarding 'Payments made on account of instalments of principal and interest to legatees ($86,250),' the court made the following modifications and alterations:

52

"In so far as legatee Humbelina Ventura is concerned (subdivision (A) 7th objection), the sum of $125.35 should be deducted from said item and restored by the executor to the assets in the final account.

"As to subdivision (B) of the 7th objection, that is, 'Regarding the unnecessary expenditure for interest, etc.' the challenged item *should be reduced* by the sum of $2,102.98, which must be restored by the executor to the assets in the final account.

"(E).—From the item of the final account entitled *'Payment of income on life annuities ($9,852.14)'* there should be deducted the sum of $2,052.14, which must be restored by the executor to *the assets* in the final account.

"(F).—As to the items in the final account for *'Traveling and extra expenses, in the United States, of the accountant* (the executor) and Pedro M. Porrata (attorney-at-law), amounting to $13,450, and the items of $18,000 *for fees of Attorney* Pedro M. Porrata,' the court made the following modifications and alterations:

"The item *for traveling and extra expenses* of the executor and his attorney in the United States, the court approves only the combined sum of_____ $3,140.00
plus transportation expenses, combined_____ 810.00
_____
Total_____ $3,950.00

"As to the fees of Attorney Pedro M. Porrata, it approves only the sum of $4,000. Grand total $7,950.

"From the aggregate amount of the above-mentioned items of the final account there should be deducted the total sum of $23,500, which the executor should restore to *the assets* in the final account.

"(G).—Regarding the item of the final account for *'Preservation, miscellaneous, and administrative expenses, etc.,* ($20,000)' the court holds that said sum *should be reduced by the sum of $10,664.95,* which the executor must restore to *the assets* in the final account.

"(H).—From the item of the final account for *'Fees of the executor ($10,257.41)'* there should be deducted the sum of $7,208.11, which the executor must restore to *the assets* in the final account.

"(I).—As to the item of the final account entitled 'Inheritance tax and interest paid to the People of Puerto Rico for account of the four heirs, $129,331.64,' it is ordered that the executor should restore to *the assets* of the final account, in favor of the opposing parties Adrián and María Luisa Mercado Riera, the following amounts, with interest thereon at the legal rate, to wit:

'For *interest* paid on the inheritance tax_____ $13,452. 29
'For inheritance tax on funds belonging to the part-
nership Mario Mercado e Hijos_____ 20,019. 15
 _____
 Total_____ $33,471. 44

"(J).—As to the item of the final account entitled '*Passbook No. 2281 of Banco de Ponce, improperly inventoried,* $325.81' the court orders that the executor should restore to *the assets* in the final account the whole sum of *$325.81.*

"(K).—The court orders that the executor should include in the final account the sum of *$428,600.33* in lieu of the sum of $413,064.63 which appears in the final account as '*credit* in favor of the decedent against the partnership Mario Mercado e Hijos.'

"And, further, that he should include in the final account the sum of $6,841.06 in lieu of the sum of $4,942.04, which appears in the final account as '*profits* accruing to the decedent, for one month and twenty days, during the year 1937–38.' "

The ex-executor, as well as the opposing heirs, has appealed to this court. The record sent up contains a transcript of the testimony which covers 2,838 pages and a transcript of the documentary evidence which comprises 855 pages. If to this are added the 320 pages of the two briefs filed by the executor and the 561 pages of those filed by the contestants, it will be seen that it has been no easy task to extract from that mountain of papers the very simple questions involved in this long and seemingly interminable dispute.

Let us consider first the appeal taken by the ex-executor, which is based on twenty errors attributed to the lower court.

■ In the first assignment it is urged that the lower court erred in not holding that the opposition to the accounts did not state facts sufficient to constitute a cause of action, and in asserting jurisdiction to take cognizance of the case.

By the Third Clause, subdivision (*g*), of the compromise contract of September 9, 1938, the contracting heirs stipulated as follows:

"(*g*) The fruits, rents, and profits or any other accessions pertaining to the estate shall be the subject of the corresponding final

account to be rendered by the executor to the other heirs, and any resulting balance shall be distributed in equal shares among the aforesaid four heirs of the decedent.

"Should any opposition or objection on the part of any interested · coheir arise in connection with any item or matter pertaining to the said final accounts—which will, of course, comprise all the quarterly accounts *and which shall be rendered within the fifteen days following the execution of this deed*—and should it be impossible to reach an amicable settlement within five days from a demand therefor by any of the contracting parties, then the difference or controversy shall be submitted to the proper judicial authority."

The appellant executor, who is also an heir of the decedent, maintains that, since the opposition filed failed to show that the opposing heirs had complied with the "condition precedent" of demanding from the other coheirs and the executor that they try to reach an amicable settlement within five days after such demand, said opposition did not state facts sufficient to constitute a cause of action or a "justiciable controversy" which might be submitted for decision to a judicial tribunal; and that, inasmuch as there was involved a condition precedent, which was "the consideration or impelling motive for the parties to bind themselves in the manner they did," none of the parties might invoke the jurisdiction of a court without alleging a previous compliance with that condition.

In the written opposition, which was dated, notified, and filed in the lower court on March 16, 1940, the contestants alleged:

"XVI. In conformity with the aforesaid contract of September 9, 1938, Third Clause, subdivision (g), 2nd par., demand is hereby made upon the coheirs Mario and Margarita Mercado Riera to state to the contestants, within five days from the service of notice of this written opposition, their assent or proposal, as well as any other explanation, if any they have, in order that it may be determined whether it will be possible to reach an amicable settlement or, if otherwise, that the difference may be submitted to the proper judicial authority."

The appellant argues that the demand set forth in the foregoing paragraph XVI can not be considered as a compliance with the above-mentioned condition precedent, first, because said demand has been made after the contestants resorted to the court and without giving them the stipulated term of five days for reaching an amicable settlement before judicial action was taken; and, second, because the demand was not directed to the executor, as accountant.

The contestants and appellees on the contrary maintain that, according to the above-mentioned clause of the compromise contract, the executor should have rendered his final account on September 24, 1938, that is, fifteen days after the execution of the contract, but he actually rendered it one year and six months afterward, that is, on March 6, 1940; that an amicable settlement could not be reached within five days after the demand was made nor one month and a half later, at the end of May, 1940, when the interested parties held a meeting in order to try to reach an agreement but without success; that the appellant executor, without any protest, attended said meeting; that after the holding of that unsuccessful meeting, the differences between the parties were ready to be submitted to the proper judicial authorities, in accordance with the contract; that the contestants moved that the case be set for hearing and the executor opposed that motion for the reasons already stated, but on September 6, 1940, the executor, through his attorney, withdrew the objection and became ready to argue the opposition to the final account on the merits; and that by this action the appellant waived the objection and was precluded from raising it thereafter. The contestants and appellees further urged that no demand could be made upon the accountant as executor because at the time the demand was made (March 16, 1940), he had already ceased as executor, inasmuch as the executorship terminated on September 1, 1939, (62 P.R.R. 350), for which reason the demand was served upon him as an heir and not as executor.

We agree with the appellees that the lower court did not commit the error charged in this assignment. Even though we should concede that the agreement to try to reach an amicable settlement before submitting the difference or controversy to the court was a condition precedent, we would have to hold, as we do hold, that the accounting executor is precluded from raising that question, first, because he failed to comply with the obligation contracted by him under the Third Clause, subdivision (g), *supra,* to render the final accounts of the executorship within fifteen days following the execution of the compromise contract; and, second, because he waived said objection when the case was called for hearing the controversy. Moreover, we think that the opposing heirs substantially complied with the alleged condition precedent, inasmuch as from March 16, 1940, the date on which the contestants notified the executor of their opposition ·to the accounts and made demand upon him to try to reach an amicable settlement, to March 27, 1940, the date on which the executor filed his answer, a period of eleven days elapsed during which the executor had an ample opportunity to try to settle the matter amicably and thus avoid its submission at the hearing which began on November 13, 1940.

The second, error assigned relates to the holding of the trial court that the executor had the burden of proof throughout the proceeding for rendition and settlement of the accounts.

The stenographic record showed that, after denying a continuance requested by the executor, the judge directed the latter, as accountant, to forthwith introduce the evidence and, without any objection, his attorney proceeded to offer in evidence the exhibits which had been attached to the quarterly accounts rendered to the heirs. Upon objection being made to many of the exhibits on the ground that the signatures had not been identified, counsel for the executor requested that the hearing be continued until the executor, who was then

ill in Washington, should be able to appear before the court for the purpose of identifying the signatures and establishing the validity of the exhibits presented. The court ordered a postponement to November 12, 1940.

At the commencement of the hearing on that date, the attorney for the executor insisted that it was incumbent on the contestants, in the first instance, to establish and maintain their objections to the accounts; that is, that in this case the burden of proof was upon the objecting heirs. Relying on §§ 587 to 590 of the Code of Civil Procedure (1933 ed.) and *Vázquez* v. *Sosa,* 16 P.R.R. 465, counsel for the accounting executor maintained that in requiring that both the quarterly and the final accounts should be sworn to by the executor and accompanied by the corresponding vouchers, the lawmaker intended to give *prima facie* authenticity to said accounts, so that, in the absence of proof to the contrary, they should be deemed correct for all legal purposes; and that when the accounts are supported by the oath of the executor, a contestant seeking to overcome the presumption of authenticity must produce evidence to that effect.

The opposing heirs on the contrary argued that, according to § 588 of the Code of Civil Procedure, "whenever the administrator or executor shall have completed his liquidation of the estate, or resigns, or is removed, or for any reason ceases to be such administrator or executor, he shall file with the court a final account sworn to by him"; that, since the final account in this case had not been sworn to by the executor, there was no legal presumption which might be considered as *prima facie* evidence of its correctness; that, under the decisions [1] in a special proceeding for the settlement of the accounts of an executor, the latter is plaintiff and the opposing party is defendant, the final account—which must be sworn to in order that it may be deemed correct as

---

[1] *Succession of Planchet,* 29 La. Ann. 520. *Succession of Dougart,* 30 La. Ann. 270.

to the calculations but not as to the items—occupying the place of the complaint and the opposition that of the answer.

The executor admitted that the final account submitted by him to the opposing heirs was not verified by his oath, but he argued that said account was rendered in accordance with the stipulations of the compromise contract; that said account was filed in the court by the contestants and not by the executor; that it is a true and certified copy of the final account which the executor would have submitted to the court and that it only lacked the formality of an oath; and that if the court thought that the oath was necessary, the executor was ready to swear to the copy which was filed with the record.

The lower court had before it a case in which neither the final account of the executor nor the opposition of the heirs had been sworn to.

In *Boerman* v. *Heirs of Boerman*, 52 P.R.R. 593, after the district court had rendered a final judgment declaring that the judicial administration of the estate of the decedent Boerman had terminated, said court, at the instance of certain heirs, entered an order directing the administratrix to render her final account. Upon an appeal having been taken by the administratrix from the decision of the lower court in the incidental proceeding for the rendition and settlement of the final account, the heirs moved to dismiss the appeal on the ground that it had been taken belatedly, that is, after the expiration of the 10–day period fixed by § 295 of the Code of Civil Procedure (1933 ed.) for appealing from an order rendered after final judgment. This court, after citing §§ 588, 589, and 590 of the Code of Civil Procedure,[2] said:

[2] "Section 588.—Whenever the administrator or executor shall have completed his liquidation of the estate, or resigns, or is removed, or for any reason ceases to be such administrator or executor, he shall file with the court a final account sworn to by him and accompanied by proper receipts and vouchers, which shall likewise be open for inspection. On filing such final account all parties interested in the estate shall be cited to the end that they may attend the final settlement of his account and the return of his bond or cancellation thereof.

"Section 589.—Eight days after the service of citation to be issued upon the order of the judge of said court, if no objections be filed to such account,

"From an examination of these three Sections it appears that the filing and approval of a final account constitutes practically a special proceeding in itself. The law has provided for the citation of all parties interested, for a full hearing if necessary and for an appeal from what the statute itself calls a 'final order, either approving the account as rendered, or modifying and amending it, and charging the executor or administrator as law may require . . .' The order terminating the judicial administration puts an end to the administrator's activities, but it is the order approving the final account that finally relieves him or her of official responsibility.

"'* * * * * * *

"We are of the opinion, therefore, that the order appealed from was a final decree in a special proceeding and hence that the appeal was a timely one."

Since in the instant case there is involved a special proceeding having all the characteristics of a plenary suit, and inasmuch as neither the final account submitted by the executor nor the opposition filed by the opposing heirs is verified, we hold that the lower court did not commit the error charged in the aforesaid assignment.

█ The third assignment presents a question which offers no difficulty whatever. The appellant executor complains of his being compelled to restore the amount mentioned in the judgment appealed from as if the four heirs had objected when only two of them had actually challenged the accounts. The only reasonable interpretation of the judgment is that the executor should restore to the hereditary estate the sums which, according to the judgment, he has improperly disbursed. When making the final payments to the heirs, each of these, the contestants, as well as those who failed to chal-

---

if in the opinion of the court the account is just and correct, an order approving the same shall be entered, discharging the administrator from responsibility, and cancelling the bond or other security which he has given. Should objections be filed to the account, the matter shall be brought on for a hearing and proof taken and the account approved or disapproved as the law and facts may justify.

"Section 590.—The district court shall make a final order, either approving the account as rendered, or modifying and amending it, and charging the executor or administrator as law may require, and an appeal may be taken from such final order."

lenge the accounts, will be entitled to receive one-fourth of the total amount restored to the estate.

■ Did the lower court err in refusing to approve, as a proper charge against the estate, the additional expenditure amounting to $11,234.16 on the restoration of the house at No. 23 Marina St.? Such is the question involved in the fourth assignment.

Under the terms of the compromise contract of September 9, 1938 (First Clause, subdivision (1)), the house designated as "Marina No. 23" was awarded to the heir Mario Mercado Riera, appellant executor herein, and the contracting heirs acknowledged *as a proper charge against the hereditary estate,* the sum of $14,200 which up to that date had been invested by the executor in the restoration of that immovable. The evidence shows that after the house had been thus awarded to him, the executor continued the work of restoration until February 29, 1940, and invested the additional sum of $11,234.16, which is challenged by the opposing heirs.

The holding of the lower court is, in our judgment, correct. Upon signing the compromise contract, the heir Mario Mercado accepted, as part of his hereditary share, a partially restored house, in which the sum of $14,200 had been invested, with the assent of all the heirs. From that moment the above-named heir acquired the full ownership of the house and of the money invested in it. We fail to find in the compromise contract, or in the evidence introduced, anything to show that the heirs had agreed to pay any additional expenses which the new owner of the property may have to incur in order to finish the restoration of the house.

■ Nor did the lower court err in sustaining the objection to the item of $56.66, charged by the executor to the heirs, for water consumed in the house at No. 23 Marina St. up to February 23, 1940. Since the house was awarded to the heir Mario Mercado Riera on September 9, 1938, it was incumbent upon him to pay for the water consumed from and after that date.

■ The lower court held that in the item of $36,100.64 for "interest paid," the executor had improperly included the sum of $16,392.25, which should be restored to the estate. Let us look at the facts.

Upon the dissolution and liquidation of the conjugal partnership which had existed between Mario Mercado Montalvo and his deceased wife, the four children and heirs of the latter became the owners of the sum of $161,199.77, represented by a credit in favor of Mario Mercado and his wife against the partnership Mario Mercado e Hijos. Pursuant to an agreement between Don Mario and his children, that sum was retained by Don Mario in usufruct and for life. Upon the death of Mario Mercado Montalvo, on August 22, 1937, the bare legal title to, and beneficial ownership of, the sum owed by Mario Mercado e Hijos passed to the four heirs of their ancestor, Doña Eufemia Riera Dubocq.

The lower court held that it was incumbent on the partnership Mario Mercado e Hijos to pay the $16,392.25, as interest on the sum owed by it to the heirs. The executor maintains that the holding is erroneous:

(a) Because in the deed of partition and award of the estate of Doña Eufemia Riera Dubocq, no provision was made for the payment of interest on the above-mentioned credit.

(b) Because, according to the compromise contract of September 9, 1938 (First Clause, subdivision (c)), the said credit, which was awarded in equal shares to the four heirs, by a deed of January 13, 1927, "shall be paid in one-fourth portions, with interest thereon at the rate of six per cent per annum from August 22, 1937, the interest to be liquidated up to the present date . . . to the heirs Adrián Mercado Riera and María Luisa Mercado de Belaval, *by separate promissory notes made payable to their respective orders and signed by the entity Mario Mercado e Hijos,* which will be delivered to them upon the execution of the deed referred to in the preceding subdivision, *and charged against the cre-*

*dits now held against the latter by the heirs (Sucesión) of* Don Mario Mercado Montalvo, amounting to $413,064.63; etc.''

The contention of the appellant executor is untenable, as it is against the weight of the evidence and is based on a premise which is contrary to the real facts. The sum of $161,199.77 was not owed by Mario Mercado Montalvo, as claimed by the accounting executor, but by the partnership Mario Mercado e Hijos, which was thus indebted to the conjugal partnership then existing between Don Mario Mercado Montalvo and Doña Eufemia Riera Dubocq. Upon the death of the latter, the credit held by her and her husband against Mario Mercado e Hijos passed, pursuant to an agreement among the heirs, to Mario Mercado Montalvo to be enjoyed by him in usufruct during his lifetime. At the death of Don Mario, the absolute ownership of the claim against Mario Mercado e Hijos was vested, in equal shares, in the four children and heirs of the decedents Doña Eufemia and Don Mario Mercado Montalvo. It is evident that the partnership Mario Mercado e Hijos was always the debtor; that the last-named decedent was first a co-owner and then an usufructuary until his death of the above-mentioned credit; and that at the time of the execution of the compromise contract (September 9, 1938), Mario Mercado e Hijos still owed to the four heirs of Doña Eufemia the total amount of the credit.

The partnership Mario Mercado e Hijos was one of the parties to the compromise contract, which was signed on its behalf by its partner and manager, Mario Mercado Riera, the accounting executor and appellant therein. The documentary evidence introduced by the opposing heirs shows that Adrián and María Luisa Mercado Riera received separate promissory notes from Mario Mercado e Hijos, pursuant to the stipulations contained in subdivision (*e*), First Clause of the compromise contract; that the amount of each of said promissory notes included interest at 6 per cent per annum

from August 22, 1937, when the testator died, to December 9, 1938, when the obligation became due; and that the promissory note issued in favor of Adrián Mercado Riera had been renewed three times, the interest accrued up to the time of each renewal having been paid by the debtor partnership, Mario Mercado e Hijos. The testimony of the expert accountant William A. Waymouth (Tr. of Ev., p. 2011), clearly shows how absurd is the contention of the executor that the compromise contract authorized him to charge in the accounts of the executorship the sum paid by Mario Mercado e Hijos as interest on the amount owed by said partnership to the heirs of Doña Eufemia Riera Dubocq. For the sake of greater clearness, we will state that, according to the evidence, the partnership Mario Mercado e Hijos was indebted to the decedent Don Mario Mercado in the total sum of $413,064.63, and that in this sum was included the $161,199.77 derived from the maternal inheritance. Undoubtedly, that was the reason why it was stipulated in subdivision (e), First Clause of the compromise contract, *supra,* that the amount of the promissory notes the partnership Mario Mercado e Hijos undertook to deliver and did deliver would be charge "to the credits now held against the latter by the heirs (*Sucesión*) of Don Mario Mercado Montalvo, amounting to $413,064.63." We find nothing in that subdivision which would authorize the executor or Mario Mercado e Hijos to charge the payment of the interest accrued on the $161,199.77 owed by Mario Mercado e Hijos against the total credit first owned by the decedent and now by his heirs, as this would be equivalent to permitting Mario Mercado e Hijos to enrich itself unjustly by paying the interest with the creditors' own funds. The lower court did not commit the error attributed to it.

██ The lower court held that the executor should restore to the estate $125.33 owed by legatee Humbelina Ventura; $2,102.48, as interest paid in connection with the first

partial payment of legacies; and $2,502.14 owed to the total estate on account of advances made by the executor to several annuitants. The appellant urges that the holding of the court is erroneous.

At the hearing the executor introduced in evidence several deeds acknowledging payment, and testified that all of the annuitants had already repaid the advances made to them, except one who still owed $938.58, which she was repaying in monthly instalments out of her monthly allowance. At the instance of the contestants, the court excluded said deeds and the testimony of the executor, holding ''that it has no jurisdiction, as there is involved a 'subsequent matter not covered by the pleading.' '' The executor stated that, as the annuitants were impecunious persons, he had to advance to them the necessary funds for paying the inheritance taxes, so as to avoid the possible attachment of property belonging to the estate.

That an executor has power to make advances to the legatees or heirs against the legacies or shares to which such persons are entitled, provided that at the time of the rendition of his final account the amounts so advanced have already been restored to the estate, is a question as to which there can be no doubt. 21 Am. Jur. p. 666, § 510, p. 670, § 514, and p. 633, § 448.

The executor was entitled to prove at the hearing on his final account, the amount of advances made by him to the legatees or heirs and the amounts returned by the latter to the estate. The lower court erred in excluding the deeds acknowledging payment and the testimony introduced by the executor. The order of restitution should have been limited to the sum of $938.58 which, according to the testimony of the executor, was then owed by the legatee Josefa Oquendo. The executor alleges that said sum has also been returned. Hence, both the error assigned and partially committed and

the question raised in the briefs have become academic inasmuch as the advanced sums have already been restored to the estate.

The lower court found that the executor should have deducted from the legacy of Humbelina Ventura the sum of $1,598 instead of the $1,472.65 which he deducted, and it ordered the restoration of the difference amounting to $125.35. The executor has not offered any reason why we should disturb the conclusion reached by the lower court.

▌ In the eighth assignment it is urged that the lower court erred in ordering the executor to restore $2,102.98 claimed to have been unnecessarily disbursed in making the first payment on account of the legacies.

The first partial payment of legacies and interest thereon was made by the executor on May 23, 1939, and, according to the final account, it amounted to $86,250. The opposing parties urged that the executor could have made those payments seven months before the time he did, that is, on October 22, 1938, inasmuch as on that date there were sufficient assets on hand, the use of which would have prevented the unnecessary outlay of the sum paid as interest.

In the will of the decedent it was directed that all the legacies, with the exception of that belonging to Pastor Mandry, should bear interest at 7 per cent per annum after ninety days had elapsed from the death of the testator, and should be paid, one-fourth of each legacy "out of the cash deposited by him in the bank, and the balance within four years, at the rate of a one-fourth portion each year." The legacy of $100,000 in favor of Mr. Mandry would bear interest at 4 per cent per annum.

The consent of the heirs to the payment of the legacies, as required by § 824 (2) of the Civil Code, 1930 ed., was granted to the executor by the Third Clause, subdivision (j), of the compromise contract.

The executor attempted to excuse his delay in making said payment, by alleging (*a*) that in October 1938 there were no funds available for the payment of the one-fourth portion of the legacies, and (*b*) that the claims of the Federal Government regarding the payment of an inheritance tax prevented the application of the assets of the estate to the payment of the liabilities thereof.

The findings made by the lower court are supported by the evidence, which we have carefully examined. According to the inventory, the net assets of the estate amounted to $929,430.48. That inventory and the final account of the executor show that on September 9, 1938, the cash deposited in the banks and on hand was $264,894.83, and the sums owed by the partnership Mario Mercado e Hijos to the heirs amounted to $413,064.63. It is manifest that in October 1938, the executor had in his possession ample funds enabling him to satisfy the legacies at that time and thus avoid the payment of interest.

The controversy with the Federal Government can not be considered as a sufficient justification for the executor to refrain from paying the legacies at the proper time. That controversy was limited to the sum of $200,000 which was deposited in the National City Bank, in the city of New York, in the name of the testator. The executor could not dispose of that sum without first obtaining the corresponding release or transfer certificate.

The lower court did not err in holding that the executor, as a trustee, was answerable to the heirs for the sum unduly paid. See Sánchez Román, *Derecho Civil*, vol. II, p. 1454.

■ 11, 12, and 17.—These three assignments should be discussed jointly, inasmuch as they involve the same question. The appellant executor urges that the lower court erred:

(*a*) In not admitting evidence to show that the 10-day period fixed by the compromise contract for the payment of the inheritance tax is and should be interpreted as a merely directory condition.

(*b*) In not holding that if said condition was not directory it was impossible of performance under the evidence introduced.

(*c*) In compelling the executor to restore to the heirs Adrián and María Luisa Mercado Riera the sum of $13,452.29, that is, one-half of the $26,904.58 collected by the Treasurer of Puerto Rico as surcharges on the amount of the inheritance tax.

The opposing heirs contend that the agreed term for the notification of death and payment of the inheritance tax was definite and mandatory in character; that compliance therewith was possible; and that the court *a quo* did not err in ordering the restitution of the sum unnecessarily paid by the executor.

The trial court made the following findings:

That the statutory term of 180 days, counted from the date of the death of the decedent, expired on February 18, 1938, and the executor did not file a notification of the death of the testator nor pay the inheritance tax until February 29, 1940, that is, two years and ten days after the expiration of said term.

That under the compromise contract (Third Clause, subdivision (*i*)) of September 9, 1938, the executor bound himself to file the notification of death "within the ten days following this date," and further bound himself to pay, upon the liquidation of the tax, the portion thereof pertaining to each of the heirs and legatees.

That on the day following the execution of the contract, the executor left for the United States in order to attend to the matter of the federal inheritance tax and did not return to the Island until March 15, 1939; and that 49 days after his return, that is, on May 3, 1939, the executor filed the notifi-

cation of death of the decedent. It took the Treasurer 115 days to liquidate the tax, which was paid on September 29, 1939.

The lower court held that the absence and stay of the executor in the United States "did not constitute unsurmountable obstacles to a compliance by the executor with the obligation contracted by him to file the notification of death within the agreed term of ten days," for even while he was in the United States he could have directed his subordinates, agents, or attorneys to prepare and send said notification together with the inventory, which had already been accepted by the interested parties and attached to the compromise contract. (Section 5, "An Act to Modify and Extend the Inheritance Tax," amended by Act No. 136 of 1939 (Laws of 1939, p. 672).)

The above-cited § 5 of the Inheritance Tax Act imposes on every executor or person authorized to administer an estate, the duty "to transmit to the Treasurer of Puerto Rico within the sixty days following the date of the death of the decedent whom he represents, a sworn notification of the death of said decedent, stating plainly: the name and residence of said decedent; the date of his death; . . . . and nearly as possible, the amount, valuation, description, and location of the estate of the decedent; etc." The Treasurer for just cause may grant an extension not exceeding sixty days for the filing of said notification. Section 9 of the same Act provides that the inheritance tax shall be paid "within the term of one hundred and eighty days after the death of the decedent"; and if it is not paid within said term, "interest at the rate of 1 per cent for each month or fraction thereof shall be charged and collected thereon."

Since the decedent died on August 22, 1937, the term of 60 days granted by said Act to the executor for filing the notification of death expired on October 21, 1937; and the term of 180 days allowed for paying the tax expired on

February 19, 1938, after which date the Treasurer was entitled to charge and collect interest at the rate of 1 per cent per month on the amount of the tax.

On September 9, 1938, when the compromise contract was executed, the executor had already failed to comply with the provisions of the statute and imposed on the heirs the additional burden of having to pay interest at 1 per cent per month on the amount of their respective shares. The lower court did not err in holding that the stipulation to the effect that the executor "within the ten days following this date, *shall make* the corresponding notification of death to the Treasurer of Puerto Rico" and that, once the liquidation was made, "the executor shall pay for account of each heir, as well as of the various legatees, the portion of the inheritance tax pertaining to each," was not a merely directory condition but a definite and mandatory agreement, whereby the executor bound himself to carry out what the law compelled him to do in order to avoid the payment of interest.

Since the evidence shows that the executor had in his possession at all times sufficient funds for the payment of the inheritance tax, and since the executor failed to present any legal excuse sufficient to justify his delay in making such payment, it is just that he should be charged with the obligation of returning to the two opposing heirs the sum of $13,452.29 claimed by them.[3]

 The executor and his attorney stayed in the United States, engaged in activities which the lower court deemed beneficial to the estate, from September 10, 1938, to March 15, 1939, or during a period of 157 days. In the final account of the executor the following items are charged to the inheritance in connection with that trip:

(*a*) Traveling and extra expenses_____ $13,450.00
(*b*) Attorney's fees_____ 18,000.00

---

[3] *The Harriman* v. *Emerick,* 19 L. ed. (U.S.) 629. *Klauber* v. *San Diego Street Car Co.,* 95 Cal. 353. *Jacksonville* v. *Hooper,* 40 L. ed. 515. 93 *Jur. Civil Española,* pp. 345, 346–350.

70

Relying on the evidence introduced by the contestants, the lower court reduced the first item to $3,950, assigning to the executor and his attorney a per diem allowance of $10 each, for 157 days, and adding to the total allowance of $3,140 the transportation expenses amounting to $810 for both travelers. We fail to find any reason for disturbing the weighing of the evidence thus made by the lower court. The item of $3,950 granted by the lower court is hereby approved. The executor must reimburse the estate for the excess amount charged, that is, $9,500, the restoration of which was ordered by the lower court.

 The second item was reduced to $4,000. We agree with the lower court that the $18,000 charged to the heirs as attorney's fees, for work connected with the federal inheritance tax, is excessive. Nevertheless, we think that the reduction made by the lower court, from $18,000 to $4,000, is also excessive. In view of the fact that Attorney Porrata remained in the United States, absent from his law office, during five months, which he devoted to the defense of the interests of the heirs, and that his services were beneficial to the estate, we are of the opinion that the sum of $7,500 is a fair and reasonable compensation for the professional services thus rendered. The item for attorney's fees will be increased to $7,500, and the executor must restore to the estate the difference, that is, the sum of $10,500 instead of that of $14,000 which he was directed to restore by the order appealed from.

 In the compromise contract (Third Clause, subdivision (h)) it was provided that the executor "shall be entitled to any remuneration established by law in his favor and also to any legal and necessary expenses incurred by reason of the executorship which will be included in the final account, etc."

The item of $20,000 for "Preservation, miscellaneous, and administrative expenses, etc." was challenged by the opposing

heirs. The lower court ordered the executor to restore to the assets in the final account the sum of $10,664.95, the amount of the expenses incurred by the executor which, in the opinion of the lower court, were not necessary nor could be legally charged to the estate.

(a) The charge of $942.54 for "Caretaking of the country house 'Abolición'" was rejected by the lower court on the ground that, by virtue of the compromise contract, the ownership of that country house passed to the heir Margarita Mercado de Mandry on September 9, 1938, and the payments made for the caretaking of the property pertained to the years 1939–40.

The appellant executor urges that the lower court erred in rejecting some of the items which make up the sum of $942.54, to wit: $367.50 paid to the caretaker of the country house for the "70 weeks covered by the period from March 8, 1938, to June 30, 1938" (sic); $9.54 for electric lighting supplied to the country house "Abolición" for the seven months elapsed from February 1 to August 31, 1938; and two expense items of $173.25 and $5.25 wholly connected with the caretaking of the property. The executor maintains that those items, which make a total of $555.64, are legitimate expenses of the executorship; and that the amount to be restored on account of the caretaking expenses should be reduced to $387.

We fail to find in the record any basis for upholding the contention of the appellant, nor any reason which would warrant us in interfering with the weighing of the evidence by the lower court.

(b) The appellant maintains that the lower court erred in reducing, from $1,500 to $960, the claims of Indalecio Rivera and Juan V. Díaz for accounting services rendered to the executorship. The contestants, on the contrary, argue that the lower court erroneously asserted its jurisdic-

tion to consider and determine those claims against the estate; and that it erred in not rejecting them in their entirety.

The lower court, after considering the whole evidence adduced in support of and against said claims, as well as the claims filed by the experts José Gorbea and Julio Benvenutti, reached, in brief, the following conclusions:

(1) That the disbursements made by the executor for the payment of fees to an expert appraiser and three accountants, in connection with the estate, were lawful and necessary for the making of the inventory required by § 586 and succeeding Sections of the Code of Civil Procedure, 1933 ed.; for the preparation of the quarterly accounts and of the final accounts of the executorship, in accordance with § 587 of the same Code; and for the fulfillment of the requisites provided by the Inheritance Tax Act.

(2) That the claims of Rivera and Díaz should be reduced "to the sum of $960 for each of them at the rate of $30 monthly."

(3) That the total amount thus reduced, that is, $1,080, must be restored to the assets in the final account.

The evidence regarding the nature and importance of the services rendered by the experts and accountants is conflicting. The lower court settled the conflict by awarding to the claimants the sums which it deemed just and reasonable, taking into account the importance of the services rendered and the amount of the estate. None of the contending parties has adduced a sufficient reason for our disturbing the ruling of the lower court which, in our judgment, is correct.

▮▮▮ The accounting executor in his final account charged the sum of $10,257.41 as the amount of his compensation for the administration of the estate. The lower court granted him only $3,049.30, and ordered him to return the difference. The appellant maintains that the lower court erred in decreeing that reduction. The contestants urge that

if any error was at all committed it consisted of having failed to order the return of the whole amount of the item; that "the executorship in this case should be deemed, and was gratuitous," § 586 of the Code of Civil Procedure (1933 ed.) not being applicable; and that in case it should be decided that the executor is entitled to such compensation, the latter should not exceed the sum of $960.

The grounds for the ruling made by the lower court were, in brief, the following:

1. In the compromise contract (Third Clause, subdivision (*h*)), it was stipulated that the testamentary executor "shall be entitled to any remuneration established by law in his favor."

2. Section 830 of the Civil Code provides that "executorship is a gratuitous office" but that the testator may, nevertheless, assign the executor such remuneration as he may deem proper, all this "without prejudice to the right they (the executors) may have to collect what may be proper for their work in the division, or for any other professional services."

3. In the will in this case no remuneration was assigned to the executor, but neither was he prohibited from receiving it.

4. Under such circumstances, the executor is entitled to receive the proportional compensation fixed by § 586 of the Code of Civil Procedure, but only on the basis of the sums received in the course of his administration.

Section 586 of the Code of Civil Procedure provides that an executor, "unless the will under which he is appointed provides to the contrary," shall be entitled to receive, as compensation for his services, 5 per centum "on sums received in the course of administration, amounting to one thousand dollars or under; two and one-half per centum on sums up to ten thousand dollars; and one per centum on sums above ten thousand dollars."

At the hearing the expert witness William A. Waymouth testified as follows:

"As I have already stated in my testimony, the money *actually received* and deposited in the banks amounts to $287,429.71. By computing five per cent on the first one thousand dollars, the result obtained is $50; two and one-half per cent on the next $9,000 is $225; and one per cent on the remaining $277,429.71 is $2,774.30, making a total of $3,049.30."

The appellant urges that the lower court erred in holding, in accordance with the Spanish text of § 586, *supra,* that the remuneration of the executor must be computed on the basis. of *"los ingresos que ocurran durante la administración,"* instead of applying the English text of said Section, according to which the remuneration should be computed "on sums received in the course of administration.".

The alleged discrepancy between the Spanish and English texts of said Section is more apparent than real. The *"ingresos"* effected in the course of the administration of a hereditary estate can be no other than the sums *received* by the executor in payment of credits owned by the decedent, or as rents and profits derived from property belonging to the estate.

The partnership Mario Mercado e Hijos was indebted to Mario Mercado Montalvo in the total sum of $413,064.63. In said sum was included that of $161,199.77, which said partnership owed to Mario Mercado and his wife. We have already seen, at the beginning of this opinion, that after the wife of Don Mario died, this credit was awarded, in equal shares, to the four children in payment of their maternal inheritance; and that those children granted to Don Mario the right to hold said credit in usufruct during his lifetime. Upon the death of Don Mario, which terminated such life usufruct, the absolute and exclusive ownership of the credit passed to the four heirs of Doña Eufemia Riera, without the executor being entitled to claim or receive the amount of the credit as a part of decedent's estate. This is shown by the

fact that, according to the provisions of subdivision (E), First Clause of the compromise contract, the whole amount of the credit was paid, in one-fourth portions, to the heirs Adrián and María Luisa Mercado Riera, "by separate promissory notes made payable to each of them and signed by the entity Mario Mercado e Hijos"; and to the two remaining heirs, Mario and Margarita Mercado Riera, by crediting their respective portions in special and separate accounts on the books of the partnership Mario Mercado e Hijos. It is evident that the executor never received nor entered as a part of the estate of Don Mario Mercado the amount owed and paid by the above-mentioned partnership to the four heirs of Doña Eufemia Riera.

The whole argument of the appellant in support of his alleged right to compensation on the credit of $161,199.77, is based on two false premises: (1) that said sum formed a part of the liabilities of the estate; and (2) that that indebtedness of the decedent was settled with the amount of the credit which the decedent held against a third person. The lower court did not err in holding that the executor was not entitled to receive any compensation on the amount of said credit. Nor did it err in holding that the right of the executor to receive compensation is limited to the amounts received in the course of his administration and that the compensation can not be determined by taking as a basis the value of the estate. See 4 Manresa, *Comentarios al Código de Enjuiciamiento Civil,* p. 403; *Ex parte Boerman,* 34 P.R.R. 120, 125.

 In the inventory there was included as a part of the assets of the estate the sum of $325.81, as the balance of passbook No. 2281 of Banco de Ponce, issued in favor of Mario Mercado and Inocencio García of Guayanilla. The executor alleges that, upon being requested by Inocencio García to deliver that balance to the latter, the former made an investigation and became convinced that the passbook

never belonged to the testator but was really owned by Inocencio García; and that he then consented to the return of the $325.81 to García, notifying all the interested parties and requesting the Treasurer of Puerto Rico to eliminate that item by deducting it from the assets of the estate.

When the action taken by the executor was challenged, he offered in evidence the testimony of Inocencio García and of Mr. Rosaly, Manager of Banco de Ponce, tending to establish that the sum deposited in the names of Mario Mercado and Inocencio García was really the exclusive property of García; that the two signatures which appeared on the card kept by the bank were those of Mercado and García; that the money thus deposited could be withdrawn by using either of the two signatures; that Mario Mercado used to make the deposits in that way so as to protect his employees better, and García had been his employee for over 35 years; and that the passbook was delivered to García on the same day when the deposit was made and García kept it in his possession until he presented it to the court.

The lower court held that the executor had no power to cancel as a charge the amount of said balance and ordered that the same be restored to the assets in the final account, basing its ruling on the decisions of this court in *Grehore* v. *Registrar,* 22 P.R.R. 30; and *Aponte & Sobrino* v. *Heirs of Pérez,* 48 P.R.R. 437, 442.

In *Grehore* v. *Registrar, supra,* it was held that an executor, even though he be an administrator of the estate, is not empowered to cancel a mortgage credit constituted in favor of the decedent nor to alienate or perform acts of strict ownership regarding the real property or real rights belonging to the estate, without the express authorization of the testator or of the heirs. It was further held that an authorization granted by the district court to the executor in an *ex parte* proceeding, without hearing the heirs and without the consent of the latter, adds nothing to the power

of the executor to execute the cancellation of a mortgage or to alienate real property. We fail to find anything in the case of *Aponte & Sobrino* v. *Heirs of Pérez* which might be applicable to the case at bar.

The instant case does not involve the performance by the executor of any act of strict ownership affecting the real property or real rights belonging to the estate. The executor assumed that the passbook in question belonged to the testator and included among the assets of the estate the balance shown by the passbook. When he became aware of his mistake and of the fact that said balance belonged to Mr. García, the executor delivered the balance to its owner and notified the heirs and the Treasurer.

Conceding, without holding, that an executor has no power to return to its legitimate owner personal property erroneously inventoried as belonging to the testator, the fact is that in a proceeding in the district court to which all the persons interested in the inheritance were made parties, the executor introduced oral and documentary evidence to show that the balance of $325.81 belonged to the holder of the passbook and not to the testator.

Since the evidence adduced by the executor was sufficient to establish the fact that said sum did not belong to the estate but to Inocencio García, and since the opposing heirs were heard and took an active part in examining the witnesses, we are of the opinion that the lower court erred in ordering the restoration of the passbook balance to the estate.

In the compromise contract of September 9, 1938, and in the final account submitted by the executor, it was stated that the credit held by the decedent against the partnership Mario Mercado e Hijos amounted to $413,064.63. In the final account said sum was included in the item entitled "Transfer of balance of the account of the estate with Central Rufina."

The contestants alleged that in the liquidation and imposition of the tax by the Treasurer, and in the inheritance tax

receipt, which documents were submitted in evidence, the above-mentioned item shows a balance of $428,600.33 instead of the $413,064.63 reported in the final account.

The lower court sustained the opposition and ordered "that the executor enter in his final account the sum of $428,600.33 in lieu of the sum of $413,064.63, which appears in the final account as a credit owned by the decedent against the partnership Mario Mercado e Hijos." The appellant executor urges that such ruling was erroneous.

At the hearing the executor introduced the testimony of José Ramón Peralta, Manager of Central Rufina, who stated that the credit owned by Mario Mercado at the time of his death amounted to $428,600.33; that in September 1937, after Don Mario had died, the partnership Mario Mercado e Hijos paid to the Treasurer of Puerto Rico the sum of $15,535.70 on account of unpaid income taxes owed by the testator at the time of his death; that when the inventory was made after the payment of $15,535.70 had already been executed, said sum was deducted from the credit of $428,600.33, which, as the result of such payment was reduced to $413,064.63, which was the amount included by the executor, with the consent of the heirs, in the inventory that was incorporated in the compromise contract; that it was true that in the notification of death the executor stated the amount of the credit to be $413,064.63, but on the other hand he failed to claim any deduction on account of the $15,535.70 paid by Mario Mercado e Hijos on behalf and for the account of the heirs as a charge against the original credit of $428,600.33; that in computing the tax the Treasurer took the sum of $428,600.33 as the amount of the credit at the time of the death of the decedent, but he included and accepted as a deduction from the estate the amount of the aforesaid income tax payment, or $15,535.70, and assessed the tax on $413,064.63 only.

In the liquidation made by the Treasurer (executor's exhibit 25) there appears the following personal credit held by the decedent: "From Mario Mercado e Hijos $428,600.33." Among the "Deductions from the estate" there appears the following item: "Indebtedness on account of income tax, $23,395.64." The executor maintains that the latter sum includes the $15,535.70 involved in this controversy.

The same witness, Mr. Peralta, stated that if from the original sum of $428,600.33 there should be deducted the sum of $23,395.64, on account of income tax, the amount of the credit would be reduced to $405,204.69.

We think that there are sufficient reasons to justify a modification of the order appealed from in the sense which we will state presently. If at the time of the death of Mario Mercado the partnership Mario Mercado e Hijos owed him $428,600.33, that and no other was the amount which the executor was bound to include in the inventory and in the notification of death as a part of the assets of the estate. If after the death of the testator, the debtor partnership Mario Mercado e Hijos, or the executor, paid on behalf of the heirs the sums which the testator owed on account of income taxes, thereby reducing the amount of the credit, then the executor is entitled to charge against the estate the amount actually paid to the Treasurer as income taxes due. To compel the executor to include in his final account the sum of $428,600.33 as a credit owned by the decedent against Mario Mercado e Hijos, without authorizing him at the same time to include among the liabilities the deduction to which said credit was subjected, would be to sanction the unjust enrichment of the heirs to the extent of the sum paid in satisfaction of a debt owed by the testator.

The order appealed from should be modified in the sense of permitting the accountant to include as a liability in his final account, the sum which, according to the liquidation made by the Treasurer and the vouchers in his possession,

was paid to the Insular Treasury as income taxes owed by the testator at the time of his death. And as thus modified the order will be affirmed.

 The lower court sustained the objection of the contestants and ordered the accounting executor "to include in the final account the sum of $6,481.06 instead of $4,942.04 as *profits accrued to the decedent for one month and 22 days during the year 1937–38,*" in the partnership Mario Mercado e Hijos.

The appellant executor urges that the amount actually received by him from the partnership Mario Mercado e Hijos was $4,942.04 which was included among the assets in the final account; and that said amount represented the 30 per cent share of the testator in the profits of the partnership during 1937–38, which amounted to $16,473.46. That assertion is supported by the testimony of the accountant Juan V. Díaz and by the account books of the executorship, which show the receipt of $4,942.04.

The contention of the opposing heirs is that, according to the documents introduced by the executor himself, the Treasurer computed the inheritance tax on an item of $6,841.06; that the executor made no objection thereto and paid the tax on that form and sought to collect from each of the heirs the proportional part of the tax thus paid; and that the conduct of the accountant precluded him from introducing any evidence to change that item.

José Ramón Peralta testified that the sum of $6,481.06 computed by the Treasurer was a mere estimate of the increase in the share of Don Mario in the partnership during the period from June 30, 1937, when the testator rendered his last income tax to August 22, 1937, the date of his death; that the profits accruing to the executorship on the 10 per cent capital share of Don Mario for the fiscal year which ended on June 30, 1938, amounted to $4,942.04, which was

the sum actually received by the administrator and which was distributed, in equal shares, among the four heirs.

The evidence shows, beyond a doubt, that the amount actually received by the executor was $4,942.04. That is the sum which, under the law, should be included by the executor in his final account. Section 587 of the Code of Civil Procedure (1933 ed.); 21 Am. Jur. 662; *McCauley's Estate,* 258 Pac. 502; *Fay's* v. *Muzzey,* 13 Gray (Mass.) 53, 74 Am. Dec. 619.

The order appealed from is erroneous in so far as it compels the executor to include among the assets of the estate a sum which exceeds by $1,539.02 the amount received by him; and it is unjust, because it would permit the unjust enrichment of the opposing heirs to the extent of that sum, which the executor would be bound to restore as a charge against him.

The order should be reversed in so far as that item is concerned.

### APPEAL OF THE OPPOSING HEIRS

This appeal is based on thirteen assignments of error, of which we will discuss only those numbered I, II, IV, and IX to XIII inclusive. The remaining five assignments have been considered and decided in the first part of this opinion.

I. The item of the final account entitled "Aid to impecunious persons" for $5,721.52, was approved. The appellant heirs urge that the lower court erred in not directing the executor to restore that sum to the assets of the estate.

That item was challenged on the ground that it did not constitute a testamentary charge nor a debt of the decedent, nor had been acknowledged by the heirs in the compromise contract.

The executor defended his actions by alleging that in the quarterly accounts rendered to the heirs the latter were furnished with all the necessary information; that all the pertinent data appear in the books and records of the execu-

torship which had always been at the disposal of the contestants; that the testator devoted a portion of his income to aiding the poor or indigent persons and had contracted obligations which the executor fulfilled in good faith; that he had made said payments to impecunious persons in obedience to the instructions which the decedent, who was his father, had given to him on various occasions in the sense of aiding certain persons who, by reason of their advanced age or infirmities were physically incapacitated to earn a living.

In approving that item, the trial judge said:

"Don Mario Mercado Montalvo, moved by a spirit of liberality, by charitable feelings, and perhaps convinced that 'giving assistance to the poor is like making a loan to God, who repays it a hundred-fold,' used to give financial aid to several impecunious persons, such as those who were called as witnesses at the hearing of opposition No. 2. The testator promised to give such aid during the lifetime of the persons assisted. His son, the executor Mario Mercado Riera, after the death of the testator, continued to bestow those benefactions up to a total sum of $5,721.52. 'Acts of mere liberality will support a contract.' (Cabanillas v. Cabanillas, 33 P.R.R. 739, 741.)"

That the sums charged by the executor under the item "Aid to impecunious persons" were actually disbursed and paid by the executor to a number of old persons and invalids to whom the testator used to give financial aid is a fact which the lower court considered as clearly established by the evidence. The latter shows that when the executor learned of the objections raised by the two appellant heirs, in May 1939 he suspended altogether in some cases and reduced in others the aid which he had hitherto sent weekly to the proteges of the testator. Hence, the honesty of the executor is not an issue but only his power to make those payments for account of the estate.

We do not criticize the trial judge for his adjustment of the conflict submitted to him by the parties. Called upon to decide whether the executor, who thought that out of

respect to the memory of his father he was authorized and bound, as executor, to continue, after the death of his father the charitable work done by the latter during his lifetime, had acted correctly, or whether he should upheld the strictly legal attitude of the opposing heirs, who protested against the use, without their consent, of funds belonging to the estate for making such benefactions and refused to ratify, as they might have done, the generous though *ultra vires* act of their brother, the executor, it seems natural that the judge should have felt more sympathetically inclined towards the one who for the sake of charity disregarded the law.

After considering the case dispassionately and calmly, we must agree with the appellant contestants that the payments made to impecunious persons and invalids did not constitute a testamentary charge. The will failed to show that the testator had made any legacy or provision in favor of indeterminate poor or indigent persons. In all the legacies and life pensions instituted by the testator the names of the beneficiaries were set forth but they did not include the names of the persons to whom the executor made payments after the death of the decedent.

The payments made by Don Mario Mercado during his lifetime and as an act of pure liberality to certain persons, did not bind him or his heirs to continue making them after his death.

The contention of the appellee executor that in making those payments to impecunious persons he had acted in obedience to confidential instructions received from the testator on several occasions, has no foundation in law for it would be equivalent to admitting the legality of secret trusts which are rejected by subdivision 4, § 714 of the Civil Code (1930 ed.), according to which the following shall be inoperative: "Those (provisions), the object of which is to leave to a person the whole or part of the inheritance in order that he

may apply or invest it, according to secret instructions given him by the testator.'' Maura, *Dictámenes,* vol. IV, pp. 163, 164.

■ The theory of the executor that the proven facts show the existence of a contract of ''life annuity'' which bound Don Mario in favor of those impecunious persons, is not tenable either,

A contract of ''life annuity'' is an aleatory contract whereby the debtor binds himself to pay a pension to one or more specified persons for life in return for a principal sum in personal or real property, the ownership of which is at once transferred to the debtor, charged with the payment of the pension. Section 1702, Civil Code, 1930 ed. ''The contract is rather a donation or a legacy, according as it is made *inter vivos* or *mortis causa.''* Manresa (1907 ed.), vol. 12, p. 61.

Besides a life annuity constituted for a valuable consideration (§ 1702, Civil Code, *supra*), the law acknowledges the possibility of an annuity being gratuitously constituted by a person on his property, and in such case the annuity has the character of a donation or benefaction made by the donor. 12 Manresa, Civil Code, 1907 ed., p. 89. A life annuity constituted gratuitously is governed by the general rules pertaining to gifts. 27 *Enciclopedia Jurídica Española,* p. 220.

Since the will contains no provision which would authorize the executor to make any payment to impecunious persons, and since no real property has been encumbered to secure the payment of the life annuities sought to be established in this case, those annuities must be governed by the legal provisions applicable to gratuitous gifts of personal property made *inter vivos.* Section 269 of the Civil Code, 1930 ed.

Section 574 of the same code provides that gifts of personal property, such as money, may be made verbally or in writing, and that:

"The verbal one requires the simultaneous delivery of the thing bestowed as a gift. In the absence of this requisite the gift shall produce no effect if not made in writing and if the acceptance does not appear in the same manner."

The evidence introduced shows that the decedent used to aid a number of necessitous persons by giving them certain sums weekly. No written or documentary evidence has been introduced to show that the decedent bound himself to continue making those weekly payments during his own lifetime or that of each of the donees. And we have already seen that in his will be failed to make any legacy or to encumber any real property for the purpose of paying those benefactions after his death. The gift which the decedent bestowed weekly on his proteges were consummated by the delivery of the donated funds to each of the donees. A gift made verbally on the above-stated circumstances does not carry with it any implied promise or obligation to make future payments. 5 Manresa, Civil Code, 116, 118.

The lower court erred in not ordering the restoration of the amount paid. The order appealed from should be modified in the sense of directing the restoration of the amount of said item.

11. The appellant heirs complain of the approval by the lower court of the item of $10,176.79, entitled "Scholarships for indigent students." The grounds of opposition to that item are that in the judgment of the opposing heirs, the outlay involved does not constitute a testamentary charge nor a hereditary debt; that the payments were not acknowledged by the heirs either in the compromise contract or in the inventory; that the executor was not authorized by law nor by the heirs to make such disbursements.

The lower court, in approving that item, held as facts proved to its satisfaction that the decedent had sent at his expense several needy or impecunious students, who had attained good academic credits and observed good conduct, to pursue professional studies in colleges located in the United

States, and assumed the obligation to pay any expenses incurred by them until the termination of their respective studies; that the decedent faithfully discharged this obligation up to the time of his death, and instructed his son, the executor, to continue to fulfill the same after his death; and that after the testator died the executor continue to pay the scholarships of the students up to the total sum of $10,176.79.

The testator, by sending the students to educational centers on the continent and promising to give them financial aid until they finished their studies, performed a lawful and purely voluntary act, but upon his promise being accepted by the students the testator became contractually bound to the latter. If after that obligation had been contracted and the young men had commenced their studies, Mr. Mercado had refused to continue to pay their expenses, there is no doubt that he could had been compelled to perform the contract entered into by him. That obligation of the decedent, which was of a purely contractual character, passed to his heirs from the moment of his death, under § 610 of the Civil Code (1930 ed.)

By way of illustration, we will state that in the American decisions cases similar to the present one have been disposed of by applying the doctrine of promissory estoppel.

Mario Mercado Montalvo was not bound in any way to provide funds for the education of these impecunious young students. The offer which he made to them as a voluntary act of pure liberality, could have been withdrawn or revoked by him at any time before the promisees, relying on the promise, should have changed their position to their prejudice. The young men in question changed their position. They had faith in the noble and generous man who offered to them what their own parents could not give them: a career. They firmly believed—and in this they were not mistaken—that Mr. Mercado would fulfill his promise and not desert them before their goal was reached. And inspired by that faith

in their protector, they renounced everything and went to the United States to study and to show, as they did, that they were worthy of the protection extended to them.

In *Matzger* v. *Arcade Bldg., & R. Co.*, L.R.A. 1915 A. 288, the doctrine of estoppel is stated thus:

"It applies not only to estop one who receives and retains a benefit from denying the validity of the transaction from which he receives it, but it also applies to estop one party to a transaction from denying the validity of the transaction which, if not sustained as valid, would put the other party, who has acted on the faith of the first party's attitude therein, in a materially worse position than he would otherwise have been."

Applying that doctrine to facts and circumstances similar to the ones under consideration herein, it has been held that "an agreement to pay the expenses of another person, if he will take a trip to Europe, in no way connected with the promisor's business, is upon sufficient consideration; and if the promisee takes such a trip, he may recover the amount of his expenditures from the promisor." 12 Am. Jur. 575, § 80.

"This principle is also illustrated by the rule that a promise even by a third person, made to induce a person to marry, is supported by a sufficient consideration even though the promisee is not required to marry a specified person. In one aspect, marriage to the person of his choice may be a benefit to the promisee. However, inasmuch as by marrying he does something that he is not legally bound to do, his change of position is treated as a detriment in law." 12 Am. Jur. 575, § 80.

It has also been held that, although abstinence from, or the discontinuance of the use of, tobacco or intoxicating liquor may be actually beneficial to the promise, such abstinence or discontinuance is sufficient consideration for a promise. 12 Am. Jur. 577, § 81. There are numerous cases in which it has been held that a person who has promised to contribute a certain sum for charitable purposes is estopped to assert the lack of consideration, where money has been

expended or liabilities have been incurred in reliance of his promise so that nonfulfillment will cause injury to the other party. 19 Am. Jur. 659.

There is no doubt that the nonfulfillment of the promise made by the decedent to the students would have caused the latter great and irreparable injury. The heirs were bound to fulfill that promise as a hereditary charge.

The lower court did not err in approving that item.

IV. The question involved in this assignment is based on the following facts:

Don Mario Mercado in his will made several legacies of $10,000 each for his grandchildren and great-grandchildren. His grandchild Adrián Vincenzo Mercado Jiménez, a son of the opposing heir Adrián Mercado Riera, was not included among those legatees as he was born subsequent to the execution of the will.

By agreement among the four heirs, the sum of $10,000 was included in the inventory attached to the compromise contract in favor of that minor, and in subdivision (j), Third Clause of said contract it was stipulated that—

"The ten thousand ($10,000) dollars set forth in the inventory for the minor son of Don Adrián Mercado Riera, *shall be subject to the same conditions affecting the legacies made in favor of grandchildren and great-grandchildren in the will.*" (Italics ours.)

The testamentary provision referred to in the foregoing clause, reads thus:

"I hereby designate Don Mario Mercado Riera as *guardian* of all the persons to whom I have herein-before left legacies and who are included among those subject to guardianship, *and for the sole purpose of the administration of said legacies.*" (Italics ours.)

In the final account of the executor, under the title "Payments made on account of instalments of principal and interest due legatees," there is shown an item reading thus: "To Adrián V. Mercado Jiménez, $3,550." That sum appears to have been paid to Mario Mercado Riera as the first

instalment of principal and interest on the $10,000 set forth in the inventory in favor of the minor Mercado Jiménez.

The opposing heirs allege that said minor was not a legatee but a beneficiary by reason of the gift *inter vivos* provided for in the compromise contract, *supra;* and that, since the minor was under the custody of his father, the contestant Adrián Mercado Riera, the instalment of principal and interest due, as well as all future instalments, should be delivered to the father of the minor donee and not to the person designated in the will as guardian of the legatees "subject to guardianship." The contestants prayed that the executor should be ordered to deliver the sum of $3,550 to the father of the minor. The executor insisted that it was incumbent upon him, in his capacity as guardian "for the sole purpose of administration" of the $10,000 donated to the minor, to receive and administer the fund in accordance with the provisions set forth in the above-quoted clauses of the compromise contract and of the will. The court *a quo* dismissed the opposition in the following terms:

"The court dismisses it, as it thinks that its function and jurisdiction in this proceeding is confined to the approval of the final account submitted by the executor and it has no power to determine any question relating to the guardianship or custody, in connection with the will, over the minor Adrián Mercado Jiménez."

The order appealed from is erroneous in so far as this point is concerned. The function of the district court in a proceeding of this kind is to carefully examine each and all of the items of the final account which may have been challenged, approving or rejecting them according to whether or not they conform to the provisions of law, to the testamentary provisions, and to any agreement made by the persons interested in the inheritance.[4]

The executor, Mario Mercado Riera, interpreting the will and the compromise contract in the sense that it was incum-

---

[4] *Oronoz* v. *Román*, 26 P.R.R. 22. *Coll* v. *Rigo*, 16 P.R.R. 302. *Antonetti* v. *Foote*, 16 P.R.R. 562.

bent upon him to receive and administer the $10,000 donated to the minor Adrián V. Mercado Jiménez, charged in the final account the amount of the first instalment of principal and interest received by him on behalf and for the benefit of the minor. The two opposing heirs maintain that the payment should have been made by the executor to the father of the minor.

Since there was involved the approval or rejection of an item of the final account, and all the interested parties—the executor and guardian of the minor and the four heirs— were before the court, we fail to see any reason why the latter could not have asserted its jurisdiction and proceeded to decide whether the amount of the item in question should be delivered to the minor's father, or whether Mario Mercado Riera was entitled to receive and administer that sum for the benefit of the infant donee.

The question to be decided does not present great difficulties. Its solution must be found in the compromise contract and in the will, which constitute the law as between the parties.

After the testator had died without making any testamentary provision in favor of the posthumous grandchild, his four children and heirs, one of whom was Adrián Mercado Riera, father of the minor, thinking that it was just and reasonable that the minor should receive the same amount which each of the remaining grandchildren and great-grandchildren was to receive as a legacy, agreed to include in the inventory a gift of $10,000 "for the minor son of Don Adrián Mercado Riera," to be charged against the estate. There is no doubt that if the four heirs making the gift had confined themselves to the inclusion of that sum in the inventory, for the indicated purpose, it would have been proper to order the executor to deliver the donated sum and interest thereon to the minor's father, who, being vested with the *patria potestas* over his child, was entitled to manage and control the

latter's property. Nevertheless, the donors, among whom was included the minor's father, wishing to place the infant donee in the same position as the minor legatees mentioned in the will, stipulated and agreed (subdivision (j), Third Clause, *supra*) in the compromise contract, that the $10,000 donated by them "shall be subject to the same conditions pertaining to the legacies made in favor of the grandchildren and great-grandchildren in the will."

We have already seen what are the conditions which, under the will, affect the legacies made in favor of the grandchildren and great-grandchildren. All the legatees mentioned in the will "who are persons subject to guardianship," that is, minors or incapacitated persons, were placed under the guardianship of Mario Mercado Riera, not as to their persons but "for the sole purpose of the administration of said legacies."

The accounting executor, as well as the opposing heirs in their respective briefs, admit that the $10,000 included in the inventory and to be paid to the minor Mercado Jiménez, out of the estate, constitutes a purely gratuitous donation *inter vivos* made by the four sole and universal heirs of the decedent in favor of the minor. Hence, as there is involved a donation which is to produce its effect *inter vivos,* the same shall be governed by the general provisions concerning contracts and obligations in all matters not determined by Title II, "Gifts" (Book Third), of the Civil Code. Section 563 of the Civil Code, 1930 ed.

The law acknowledges the right of the donor to impose conditions and provides that "the gift shall be revoked at the instance of the donor if the donee has not complied with any one of the conditions imposed upon him by the former." Section 589, Civil Code. In the instant case, the four donors being capacitated to contract and to dispose of their property and hence, to make the gift subject to such conditions as they deemed advisable, agreed and stipulated that the sum donated

by them to the minor shall not be delivered to the donee until the latter becomes of legal age, and that in the meantime the donated sum should remain in the possession of Mario Mercado Riera, to be administered and preserved for the benefit of the donee. The opposing heir, Adrián Mercado Riera, father of the minor and one of the four donors, who stipulated and accepted the conditions imposed by them when making the gift, is not entitled to claim the donated sum or to repudiate those conditions. Since this obligation, arising from the compromise contract, is not contrary to law, morals, or public order, it has the force of law between the contracting parties and must be fulfilled. Sections 1044 and 1207 of the Civil Code, 1930 ed.

For the reasons stated we hold that the item in question should be approved.

 IX. The facts which gave rise to this assignment are, in brief, as follows:

Mario Mercado Montalvo had a personal savings account in the Ponce branch of the National City Bank of New York. The balance which existed in his favor in that account, at the time of his death on August 12, 1937, amounted to $201,871.02.

On April 5, 1937, Mr. Mercado personally withdraw from that account the sum of $47,000. Pursuant to his instructions, the bank transferred the $47,000 to its central office in San Juan to be delivered to José R. Peralta, Manager of Mario Mercado e Hijos. On the same day said sum was delivered to Peralta and Pastor Mandry, Jr., against the receipt signed by the former on behalf of the partnership Mario Mercado e Hijos. On the following day, Peralta and Mandry tendered to Elvira Olivieri Cummins and the Lluveras, of Yauco, the sum of $45,359.50, by reason of a priority which the partnership Mario Mercado e Hijos claimed in connection with the purchase of certain land. Upon the refusal of Mrs. Olivieri and the Lluveras to accept the money, Mr. Mandry

brought an action against them in the District Court of Ponce, and on behalf of the above-mentioned partnership he deposited that sum in court.

In the inventory attached to the compromise contract, the executor failed to include the alleged credit for $45,359.50 in favor of the decedent and against Mario Mercado e Hijos; but it was expressly stipulated that all credits, rights, and claims belonging to the decedent which might turn up or be discovered in the future, would be considered as inventoried. In the notification of death sent to the Treasurer, the executor included as belonging to the decedent the balance which appeared in the savings passbook, amounting to $201,871.02; and on the basis of that sum he paid the inheritance tax.

Mario Mercado Riera, besides being the executor and managing director of Mario Mercado e Hijos, was the person who signed and verified the complaint regarding the deposit of the $45,359.50; but neither in the books of the partnership nor in those of the executorship was any entry made respecting said deposit.

The opposing heirs prayed that the executor be ordered to include in his final account the amount of said credit, plus interest thereon. The executor objected, and alleged that the lower court lacked jurisdiction within the proceeding for settlement of the final account, to decide whether or not Mario Mercado e Hijos was indebted to the heirs of Mario Mercado in the sum of $45,359.50, as a loan. The court held that it lacked jurisdiction to decide the question raised by the contestants, because "it is convinced that in passing upon the additional opposition, marked with the letter (a), it would unavoidably have to pass upon the title, that is, whether or not the $45,359.50 belonged to Don Mario Mercado Montalvo when it was withdrawn from the National City Bank in order to be deposited in court by the partnership Mario Mercado e Hijos"; and because this was not a proper proceeding for establishing the ownership in favor

of or against a third person, ''in this case, the partnership Mario Mercado e Hijos, over which the court has not jurisdiction in the present proceeding.''

The appellant contestants maintain that this ruling is erroneous and should be reversed.

The facts stated above are supported by the evidence introduced by the opposing heirs, which was strengthened rather than controverted by the one adduced by the executor. The purpose sought by the contestants in introducing their evidence was not to demand a decision adjudging Mario Mercado e Hijos to pay to the Heirs of Mercado the sum loaned by Don Mario to the partnership to be deposited by the latter. The lower court had no jurisdiction to make such an adjudication, inasmuch as Mario Mercado e Hijos was not a party to the proceeding nor had submitted itself in any way to the jurisdiction of the court.

Nevertheless, the opposing heirs were entitled to introduce evidence tending to show that certain funds which personally belonged to the decedent had been loaned by the latter to the partnership Mario Mercado e Hijos in order to enable the latter to make the deposit in court. Since the evidence adduced was sufficient to establish *prima facie* the obligation on the part of Mario Mercado e Hijos to repay, to Don Mario Mercado or his heirs, the sum loaned, the lower court had jurisdiction to order the executor to include the alleged claim among the assets of the estate. The mere inclusion of the claim in the inventory of the estate does not injure any right belonging to the supposed debtor, the partnership Mario Mercado e Hijos, inasmuch as the latter will have an opportunity to be heard and to defend itself if and when the allotee or allotees of said claim seek to enforce it by judicial action. The only effect of the inclusion sought is to lay a foundation for the allotee of the claim to demand its payment.

We have carefully examined the whole evidence. We regard it as ample and sufficient to establish *primā facie* the right of the opposing heirs to have included in the inventary, as a chose in action belonging to the estate, their right to claim the repayment of the alleged loan.

The ruling complained of will be reversed and substituted by another directing the inclusion of the alleged claim in the inventory and in the final account of the executor.

■ X. The appellant contestants requested the inclusion in the final account of the executor, of the sum of $5,250, which appears in the books of Mario Mercado e Hijos under the title *"Fondo Panteón de Familia"* (Family Burial Vault Fund). The lower court denied the inclusion sought. The appellants urge that such a denial is erroneous. Let us look at the facts.

Doña Eufemia Riera Dubocq had been granted an award for damages sustained by her in consequence of the sinking of the S.S. "Carolina," which was torpedoed by a German submarine in 1917. After this lady had died, her surviving husband, Don Mario Mercado, received the sum of $4,608.96 in payment of the amount of the award together with interest thereon. The District Court of Ponce designated the widower as the administrator of that sum, which was deposited in Banco de Ponce in account entitled "Mario Mercado and Family." On June 22, 1931, when the deposit amounted to $5,250, the administrator withdrew it from the bank and transferred it to the partnership Mario Mercado e Hijos, in whose accounts books it appears under the title *"Fondo Panteón Familia,"* it being stated in the voucher that the money was derived from "cash delivered by Don Mario Mercado Montavo for repairs and completion of the family burial vault."

The order appealed from, in its dispositive part reads thus:

"When the amount of the award granted by reason of the sinking of S.S. 'Carolina' was received, Mr. Mario Mercado Montalvo was

alive and his wife had already died; at the time of the sinking of the Carolina, Doña Eufemia Riera Dubocq was married to Mario Mercado Montalvo and the award was made for 'damages, physical suffering, and material damages' (*sic*) sustained by Doña Eufemia Riera Dubócq.

"There is no doubt that the award for damages recovered belonged *to the conjugal partnership*. (Sections 1301 and 1307 of the Civil Code, 1930 ed.; *Vázquez v. Valdés*, 28 P.R.R. 431; and numerous cases decided by the Supreme Court of Puerto Rico.)

"The four children of the marriage, as heirs, are the sole and exclusive owners of the $5,250, amount of the damages, which was deposited in the civil partnership Mario Mercado e Hijos, now composed of those same four heirs.

"The court thinks, and it so declares, that that sum, belonging as it does to the heirs, should be included in the general inventory of the estate among the properties subject to partition, and should be delivered by the partnership Mario Mercado e Hijos which holds it as bailee, as soon as a demand is made upon it therefor. (Sections 1666 and 1675 of the Civil Code, 1930 ed.)

"But, passing now upon the additional opposition marked with the letter (F), which relates to the final account of the executor, the court thinks, and it so holds, that 'said sum of $5,250 has never been delivered to Mario Mercado Riera in his capacity as executor of Mario Mercado Montalvo and, consequently, its inclusion in the final account of the executorship is not proper. (Sections 54 and 55 of the Law of Special Legal Proceedings, embodied in §§ 587 and 588 of the Code of Civil Procedure, 1933 ed.)

"Therefore, the court considers that it should dismiss and does hereby dismiss, the additional opposition marked with letter (F)." Rec. pp. 90–93.)

The order appealed from is partly erroneous and should be modified.

If, as the lower court correctly stated, the sum of $5,250 belonged to the conjugal partnership which existed between Don Mario Mercado and his wife, upon the dissolution of that partnership by the death of the wife, the ownership of one-half of said sum passed to her four heirs as a part of their maternal inheritance, and the other half became the property of the widower, Mario Mercado Montalvo, as his

share in the dissolved conjugal partnership. Upon the death of Don Mario, the one-half portion which belonged to him, passed in equal shares to his four heirs. The latter are, therefore, the owners of the whole of the compensation award, one-half of which they acquired by inheritance from their mother and the other half as a part of the paternal inherit- ance.

The accounting executor can not be compelled to include in his account the one-half portion inherited by the four heirs from their mother, inasmuch as it does not form a part of the estate of Mario Mercado Montalvo. But he can and should be compelled to include in the inventory and in his final account the one-half of the compensation award which belonged to the decedent as his share in the community property.

The decision appealed from should be reversed. In lieu thereof the accounting executor should be ordered to include in the inventory and in his final account a credit for $2,625, that is, the one-half share belonging to the decedent out of the item "*Fondo Panteón Familia,*" which shows a total of $5,250, according to the account books of Mario Mercado e Hijos.

█ XI. This assignment relates to the refusal of the lower court to order the executor to include among the assets of the estate in the final account the sum of $1,750.26, instead of the $1,350 entered by him under the item "Profits accrued in favor of the decedent and payable by Bazar Atocha Inc., on August 22, 1937, the date of his death."

The evidence in regard to this item is conflicting. The lower court settled the conflict by deciding that the sum actually received by the executor on that account was $1,350, which appears included in the final account under discussion. We fail to see any reason why we should disturb the finding thus made. The decision as to this item will be affirmed.

█ XII. The lower court after passing upon the objections to the final account, ended its opinion by saying:

"The court is of the opinion that an order should be entered, as a final writ, making in the final account of the executor the modifications and changes determined in the within statement of the case and opinion; and the court orders that, in accordance with law and justice, any resulting balance, whether in money *or in property,* should be allotted to the persons entitled thereto, that is, the four heirs of the decedent, etc."

The appellant contestants maintain that the foregoing pronouncement is erroneous in so far as it orders the partition or allotment of real property belonging to the estate; that no question whatsoever relating to that real property was raised before the lower court or submitted to its decision; and that the only matter which was submitted for decision was the correctness of the final account presented by the executor "as to the improper inclusion or omission of funds, expenses, and accessions to the property and the corresponding distribution of any balance resulting from the final account in favor of the parties."

The appellant contestants are right. In the compromise contract made by the four heirs it was stipulated:

"(g) *The fruits, rents, and products of, as well as any other accessions to, the estate* shall be the subject to the corresponding *final account* to be submitted by the Executor to the other heirs, and any resulting *balance shall be distributed in one-fourth portions* among the aforesaid four heirs of the decedent." (Italics ours.) (Third Clause, subdivision (g).)

The partition and allotment of the real property was agreed to by the heirs in paragraph (f), Third Clause of the compromise contract, thus:

"The remaining properties of the estate of Don Mario Mercado Montalvo, as shown by the aforesaid inventory, together with any others which may turn up afterwards as belonging to the decedent, *shall be deemed, and are hereby* apportioned, in equal shares, to the four heirs . . ., who will at all times endeavor to avoid the continuation of the common ownership." (Italics ours.)

The previous apportionment of the properties, made by the heirs themselves in virtue of the compromise contract,

was acknowledged by this court in *Mercado v. District Court*, 62 P.R.R. 350, 369. Hence, it was not necessary to make any pronouncement, such as the one contained in the order appealed from, regarding the allotment of the properties, which the heirs had already apportioned among themselves, share and share alike.

The order appealed from should be modified in the sense of limiting its effects to the distribution among the heirs of any resulting balance, in cash or in credits or choses in action, which may not have been allotted as yet by virtue of the compromise contract.

XIII. We are not convinced that the lower court abused its discretion in not adjudging the accounting executor to pay, out of his personal funds, the costs and attorney's fees of the opposing heirs.

The order appeal from will be modified in accordance with the terms of this opinion, and as thus modified, the order will be affirmed.

Mr. Justice Córdova did not participate herein.